**REFRIGERADORA DEL NOROESTE S.A., Plaintiff-Appellee,**

v.

**Henry APPELBAUM, Doing Business as Penguin Frozen Foods, Defendant-Appellant.**

**No. 11717.**

United States Court of Appeals Seventh Circuit.

Oct. 30, 1957.

Rehearing Denied Dec. 3, 1957.

Stanford Clinton, Robert A. Sprecher, Frank A. Karaba, Chicago, Ill., for defendant-appellant.

Louis A. Kohn, Patrick W. O'Brien, Miles G. Seeley, Chicago, Ill., for plaintiff-appellee, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

DUFFY, Chief Judge.

Plaintiff will hereinafter sometimes be referred to by its trade name "Reno." Plaintiff brought this suit against defendant for sums alleged to be due under a contract for the sale of shrimp. Defendant answered and interposed several counterclaims. A jury was unable to agree upon a verdict. The trial court then granted plaintiff's previously made motion for a directed verdict; denied the motions made by defendant and entered judgment against defendant for approximately $210,000 plus interest.

Reno is a Mexican corporation engaged in the business of purchasing, freezing, packaging and distributing shrimp. Reno produced about one-eighth of the total production of West Coast of Mexico shrimp. Defendant is a resident of Illinois engaged in the frozen food business. He distributes shrimp throughout the United States and Canada.

On October 19, 1950, plaintiff and defendant executed a written contract under which plaintiff was obligated to deliver to defendant for sale, all of plaintiff's production of shrimp through August 15, 1951 with the exception of shrimp sold for consumption in Mexico.[1] Defendant agreed that he would not distribute Mexican shrimp other than that received from plaintiff and agreed to and did lend $68,000 to plaintiff. Defendant also agreed to establish a letter of credit simultaneously with notification by plaintiff that it was prepared and ready to ship a carload of shrimp. Each letter of credit was to cover 75% of the market value of the carload of shrimp delivered.

Under the contract defendant was to remit to plaintiff 93% of the price for which defendant had sold the shrimp after deducting all expenses paid or incurred by defendant in connection with the transportation of the shrimp. The contract also provided that on or before the 15th of each month, defendant was to deliver to Reno a report with specified information as to shrimp sold. Defendant agreed that simultaneously with the delivery of such report it would pay to plaintiff the balance due on all sales made by defendant "as disclosed by such report."

Under Clause 18 the contract would expire on August 15, 1951, and on August 15 of each succeeding year thereafter if the contract were renewed. Under this same clause the contract was to be automatically renewed for another year unless either party notified the other to the contrary by March 1st of each year.

On July 22, 1952, the parties executed an extension agreement which modified the terms of the original agreement. By this modification the term of the contract was extended for two years and the plaintiff was given the option whether or not defendant was to furnish letters of credit. If defendant did furnish letters of credit defendant would continue to remit 93% of the sale price of the shrimp, otherwise defendant was to remit 95%.

On February 25, 1953, Reno sent defendant a telegram stating it was Reno's will to terminate the contract and stating the contract by its terms would thus end on August 15, 1953. Defendant promptly wired Reno that the contract was not subject to cancellation until 1954. Then followed an exchange of letters and telegrams in which Reno insisted the contract was canceled and defendant insisted that the contract remained in full force and effect until August 15, 1954.

---

1. There were other conditions not material here giving effect to possible requirements under Mexican law.

Upon giving the cancellation notice, Reno, through its General Manager, Pedro Pinson, began negotiations for the formation of a new plan of distribution of its shrimp. Reno was instrumental in forming a Mexican organization called Exportadores Associados (hereinafter called E.A.) which consisted of five West Coast of Mexico shrimp producers whose combined production amounted to approximately one-fourth of the total production of West Coast of Mexico shrimp. These producers, including Reno, were stockholders in E.A. In June, 1953, an American corporation called Crest Importing Company, with headquarters at San Diego, California, was formed. This corporation was owned entirely by E.A.

A contract was executed on October 3, 1953 between E.A. and Crest whereby E.A. was to sell and Crest was to purchase all of E.A.'s production of shrimp. All of the stockholders of E.A. except Reno had previously agreed to sell their entire production to E.A.

On September 24, 1953, upon demand of the defendant, conferences were held in Chicago in an endeavor to reach an amicable settlement. Among those attending were defendant, his son and attorney; John Willis, President of Crest, and Oscar Fraustro, chairman of Reno's board of directors, and general comptroller of Nacional Financiers which is an agency of the Mexican government and owned 75% of Reno's stock. Reno offered defendant a subbrokerage under Crest, and in the alternative offered to make settlement payments of $40,000. Defendant refused these offers and made counter offers which were rejected by Reno.

On October 3, 1953, Reno sent a telegram to defendant admitting the contract was in full force and effect. Reno demanded payment on or before October 7, 1953 of all sums due as a result of previous shipments of shrimp. The payment requested related to the shipment of cars 31 through 38 during the period from October, 1952 to June, 1953. The telegram also stated that plaintiff anticipated shipping the first car of shrimp about October 9th and instructed defendant to open a letter of credit to cover same. In a covering letter Reno stated any further delay in making payment might result in Reno's financial failure.

Defendant replied by telegram dated October 6, 1953, wherein defendant stated that in the light of his recent experience with plaintiff he was entitled to adequate security for plaintiff's performance. Defendant also stated he was puzzled at plaintiff's direction to open only one letter of credit when plaintiff had previously requested five or more at the opening of the season.

By telegram dated October 8, 1953, defendant stated he would continue to remit for cars as they were "completely sold out in accordance with past practice so long as" plaintiff lived up to the agreement. On October 20, 1953, plaintiff telegraphed that it considered defendant's failure to make payment as requested in plaintiff's telegram of October 3 to be a most serious breach of contract. Plaintiff further stated that because of defendant's breach it refused to ship him any more shrimp. Defendant then was instructed to make payment as directed to the First National Bank of Chicago and to deposit with that bank all warehouse receipts covering plaintiff's shrimp that defendant had not sold. Thereafter, this suit was filed seeking payment for cars 31 through 38 which were shipped to defendant during the 1952–1953 season. Defendant filed an amended counterclaim alleging that plaintiff had breached the contract as a result of which defendant suffered damages well in excess of the amount of plaintiff's claim.

On November 10, 1954, defendant filed a counterclaim alleging the breach by plaintiff of an oral agreement whereby plaintiff agreed to undertake the breading of one million pounds of shrimp yearly. On June 3, 1955, four days before the date set for the commencement of trial, defendant sought to file instanter, an amendment to his amended answer and counterclaim, setting forth a claim based upon alleged violation by plaintiff of the Clayton and Sherman

Anti-Trust Acts, 15 U.S.C.A. §§ 1–7, 15 note, 12 et seq. The Court denied leave to file such amendment.

■ We agree with defendant's contention that the plaintiff's telegram of February 25, 1953 was an anticipatory breach of contract. Plaintiff desired to terminate the contract apparently believing it had the legal right so to do. However, after being advised by American counsel that the contract was in force until August 15, 1954 and could not be terminated on August 15, 1953, plaintiff promptly notified defendant that the contract was in full force and effect.

The Mexican shrimp season runs from October to July of the following year. At no time had plaintiff shipped shrimp to defendant prior to the month of October. We agree with the trial court that plaintiff's telegram of October 3, 1953 had the effect of restoring the contract to full validity. Plaintiff's anticipatory breach was effectively withdrawn before plaintiff's duty of immediate performance arose.

Defendant argues that plaintiff's notice of intent to perform was ineffective because plaintiff could not then perform due to commitments with E.A. and Crest. Again we agree with the trial court that the record is devoid of evidence to prove Reno became bound by written contract or otherwise to sell its product to either E.A. or Crest.

■ Defendant next contends he was under no duty to pay plaintiff on October 3, 1953 because, according to a practice followed by the parties, payment for each car of shrimp became due only after that car had been completely sold out. However, defendant's letter of July 22, 1952 referring to the extension agreement, clearly demonstrates no such practice existed. The written contract obligated defendant to pay plaintiff for all shrimp which the monthly report revealed were sold during the preceding month. The trial court was correct in holding that proof had not been made of an agreement to vary that condition of the written contract.

■ The fact is defendant refused to pay for the shrimp because he was fearful that after Reno received the remittance for the amount past due it would then refuse to make further shipments of shrimp. Defendant was, of course, faced with a very practical problem. He could not obtain service of process on Reno, a Mexican corporation. He desired to withhold funds as a club to compel Reno to continue shipping carloads of shrimp to him. But by thus refusing to pay for the amounts past due he breached the contract and Reno was legally entitled to terminate the contract and to sue for the balance due.

We hold the District Court was correct in granting plaintiff's motion for a directed verdict which had been taken under advisement pursuant to Rule 50(b), Federal Rules of Civil Procedure, 28 U.S.C.A. We agree with the determination of the trial court that as a matter of law defendant's refusal to pay for the shrimp it had received from Reno was a breach of contract entitling plaintiff to bring this suit. The judgment entered for plaintiff in the sum of $210,878.29 was proper.

■ Defendant asserts error because the court, at the close of defendant's case, struck the so-called "breaded shrimp counterclaim." Defendant alleged an oral agreement whereby Reno agreed to bread shrimp for defendant at four cents a pound. Plaintiff was to furnish all necessary labor and defendant was to furnish all cartons, labels and breading material. Plaintiff alleged the agreement was to continue until the written contracts for unbreaded shrimp had terminated.

The trial court held on the undisputed evidence that as the alleged oral contract was to run concurrently with the written contracts of October 19, 1950 and July 22, 1952, this would be contrary to the Illinois Statute of Frauds (Ill.Rev.Stat. 1955, c. 59, § 1) which provides that "no action shall be brought * * * upon any agreement that is not to be performed within the space of one year from the making thereof * * *." We hold

the trial court was correct in dismissing this counterclaim.

Defendant further contends the trial court erred in rejecting certain exhibits. We find no reversible error in this respect.

Defendant complains of orders of the trial court as to matters of pretrial discovery. We do not find any prejudice to defendant in these rulings.

 On June 3, 1955, defendant sought leave to file instanter an amendment to his amended answer and counterclaim, alleging plaintiff had entered into a combination, conspiracy and monopoly in violation of the Clayton and Sherman Anti-Trust Acts. The trial of this cause had been theretofore set for June 7, 1955. Clearly the trial court acted within its discretion in not permitting the trial of the main cause to be postponed until after such time as plaintiff had filed its responsive pleading. However, it was not necessary that the trial of the main cause be postponed as the court could have permitted the filing of the amendment and ordered a separate trial thereon.

The motion to file was accompanied by an affidavit stating that "within the past few weeks, counsel for defendant learned additional facts which they believe constitute a further cause of action. * * *" Counsel claims to have obtained this information while taking depositions in Mexico. He returned to the United States from that trip on May 24, 1955.

Rule 15(a) Federal Rules of Civil Procedure provides that leave to amend shall be freely given when justice so requires. By refusing to permit the amendment to be filed, defendant was, in fact, denied his day in court. Plaintiff is a Mexican corporation and it seems to be conceded, is not available for process anywhere within the United States. Under the circumstances of this case, we hold the denial of the motion to file this answer and counterclaim, was error. An order should be entered permitting such filing and giving plaintiff an appropriate time to file an answering pleading. The order should then provide for a separate trial upon the issues thus raised. The trial court, in its discretion, could withhold execution on the judgment which we have herein affirmed, until such time as the antitrust issues have been determined.

Affirmed in part, reversed in part.